UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATASHA GRACE, MINOR CHILD MG,<br>MINOR CHILD MG2, MINOR CHILD MG3,<br>MINOR CHILD AG, MINOR CHILD MP, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 19-10930-GAO |
| BOARD OF TRUSTEES, BROOKE EAST | ) | |
| BOSTON, BROOKE SCHOOL FOUNDATION, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORTS AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

May 25, 2022

DEIN, U.S.M.J.

### I.    INTRODUCTION

This action arises out of alleged incidents of bullying and harassment against the

plaintiff, Minor Child MG ("MG"), while he was a student at the Brooke Charter School East

Boston ("Brooke East Boston" or "School") in Boston, Massachusetts.   In 2019, after MG's

mother, Natasha Grace ("Ms. Grace" or "mother"), withdrew him from the School, MG, his

mother, and his four minor siblings filed this action in Massachusetts state court against the

School, its Board of Trustees and the Brooke School Foundation, Inc., claiming that the

defendants' failure to protect MG from abuse by other students and members of the School's

staff, as well as their failure to comply with certain reporting requirements, violated MG's rights

under federal and state law, violated Ms. Grace's rights under state law, and caused all the

plaintiffs to suffer a loss of consortium.  By their Complaint (Docket No. 1-2) ("Compl."), the plaintiffs asserted eighteen claims against the defendants, including claims for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (Count I)[1]; claims pursuant to 42 U.S.C. § 1983 for the denial of equal protection under the Fourteenth Amendment (Counts II-III); deprivation of equal rights pursuant to the Massachusetts Equal Rights Amendment ("ERA") and Mass. Gen. Laws ch. 76, § 5 (Count IV); violations of Massachusetts' anti-bullying law, Mass. Gen. Laws ch. 71, § 37O (Count V); negligence (Count VI); negligent infliction of emotional distress (Counts VII-VIII); violation of the state parental notification law, Mass. Gen. Laws ch. 71, § 32A (Count IX); failure to report a threat to personal safety under 603 C.M.R. § 33.00 (Count X); negligent supervision of students (Count XI); negligent hiring, supervision and retention (Count XII); and loss of consortium (Counts XIII-XVIII).  On April 23, 2019, the defendants removed the case to this court pursuant to this court's federal question jurisdiction.

The matter is presently before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 44).  Therein, the defendants contend that there are no material facts in dispute and that they are entitled to judgment as a matter of law with respect to each Count of the plaintiffs' Complaint.  As described below, this court finds that the plaintiffs' claims for violation of Title IX should be resolved by a factfinder at trial, but that the defendants are entitled to summary judgment with respect to the remaining claims.  Accordingly, and for all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the defendants' motion for summary judgment be ALLOWED IN PART and DENIED

---

[1] Count I of the plaintiffs' Complaint is entitled "Claims for Violations [of] Federal Rights Under *Title VII* AND *Title IX*" but contains no further references to Title VII and does not otherwise purport to state a claim under Title VII.  Therefore, this court has construed Count I as a claim under Title IX.

IN PART such that the motion be allowed with respect to Counts II-XVIII but denied with respect to Count I of the Complaint.

## II.   <u>STATEMENT OF FACTS</u>[2]

The following facts are undisputed unless otherwise indicated.

### <u>The Brooke Charter Schools</u>

The facts giving rise to the instant case occurred during the time period from 2015 through 2018, when MG was attending fourth through sixth grade at Brooke East Boston.  The School is part of the Brooke Charter Schools, a network of three high performing K-8 public charter schools and one high school that are located in Boston, Massachusetts.  (Def. Ex. D at 6 of 107).  All of the campuses are governed by the defendant Board of Trustees and receive fundraising support from defendant Brooke School Foundation, Inc., a nonprofit fundraising entity.  (DF ¶¶ 5, 7; PR ¶ 7).  The stated mission of the Brooke Charter Schools "is to provide an academically rigorous public education to students from the cities of Boston and Chelsea that will ensure they are prepared to attend and succeed in college."  (Def. Ex. D at 6 of 107).

At the time MG attended the School, Jon Clark ("Mr. Clark") served as a Co-Director of the Brooke Charter Schools and had overall responsibility for the successful operation of the schools.  (DF ¶ 2).  Both Mr. Clark and his Co-Director, Kimberly Steadman ("Ms. Steadman"),

---

[2] The facts are derived from: (1) the "Defendants' Local Rule 56.1 Concise Statement of Material Facts as to Which There is No Genuine Issue to be Tried" (Docket No. 46) ("DF") and the exhibits attached thereto ("Def. Ex. __"); and (2) the "Plaintiffs' Opposition to Defendants' Local Rule 56.1 Concise Statement of Material Facts as to Which There are Genuine Issues to be Tried" (Docket No. 54) ("PR") and the exhibits attached thereto ("Pl. Ex. __").  However, this court has not credited facts that are not supported by cited portions of the record.  <u>See</u> Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ....").  Unless otherwise indicated, page citations are to page numbers on the exhibits rather than the court's ECF numbers.

reported directly to the Board of Trustees, while the Principals of each charter school reported to Mr. Clark and Ms. Steadman.  (DF ¶ 5; PR ¶ 5).  Molly Cole ("Ms. Cole") served as the Principal of Brooke East Boston and had overall responsibility for the School.  (DF ¶ 8; PR ¶ 5). She was assisted by three Assistant Principals and a Dean of Students to whom she delegated certain responsibilities.  (DF ¶ 8; PR ¶¶ 5,8).  Yasenia Dudley ("Ms. Dudley"), the Dean of Students, had primary responsibility for maintaining and enforcing the School's Code of Conduct.  (DF ¶ 9).  This included responsibility for investigating complaints of bullying, harassment, and other disciplinary matters, as well as responsibility for disciplining violators. (See Pl. Ex. 4 at 12, 24, 27).  According to Ms. Dudley, she received no specific training on investigation procedures prior to or during her employment at Brooke East Boston.  (Id. at 13-14; PR ¶ 10).  Nevertheless, it is undisputed that Ms. Dudley holds a master's degree in mental health counseling and is currently pursuing a doctorate in education.  (Def. Ex. B at 9; DF ¶ 10).

The School's Code of Conduct is set forth in the Brooke Charter Schools Student & Family Handbook ("Handbook"), a comprehensive document containing the procedures, policies and practices applicable to grades K-8.  (Def. Ex. D at 8-30 of 107).  According to the Handbook, the Brooke Charter Schools are "unequivocally committed to providing a safe and orderly environment in which students can maximize their academic achievement."  (Id. at 8 of 107).  To that end, students who violate the Code of Conduct may face certain consequences, including but not limited to, a citation known as a "Community Violation," a referral to the Dean of Discipline, and the loss of privileges, detention, suspension or expulsion.  (Id. at 8-12 of 107; Def. Ex. C ¶ 12).  The record establishes that MG had disciplinary issues, and received an increasing number of Community Violations and detentions during the three years when he

4

was enrolled at Brooke East Boston.  (PR ¶ 16; Pl. Ex. 3 at 204-05).  The plaintiffs contend that

the teachers used subjective criteria to determine whether a student's conduct was

inappropriate and had too much discretion in determining what discipline was warranted in the

classroom.  (See PR ¶¶ 16-17).  They also contend that MG's escalating behavioral issues

resulted from the School's failure to protect him from bullying and harassment by his peers and

certain members of the School's staff.  (See PR ¶ 22).

The Handbook includes a "Bullying and Prevention Policy," which calls on the Principal

to create and maintain a "Bullying Prevention Plan" and states, inter alia, that "[t]he school will

take specific steps to create a safe, supportive environment for vulnerable populations in the

school community, and provide all students with the skills, knowledge, and strategies to

prevent or respond to bullying, harassment, or teasing."  (Def. Ex. D at 77-78 of 107; see also PR

¶ 3).  The term "bullying," as used in the Bullying and Prevention Policy, is defined in

accordance with the Massachusetts anti-bullying statute, Mass. Gen. Laws ch. 71, § 37O, as

follows:

> BULLYING, as defined in MGL c. 71, § 37O, is the repeated use by one or more
> students or by a member of a school staff ... of a written, verbal, or electronic
> expression or a physical act or gesture or any combination thereof, directed at a
> target that:
>   i.   causes physical or emotional harm to the target or damages to the
>        target's property;
>   ii.  places the target in reasonable fear of harm to himself or herself or of
>        damage to his or her property;
>   iii. creates a hostile environment at school for the target;
>   iv.  infringes on the rights of the target at school; or
>   v.   [m]aterially and substantially disrupts the education process or the
>        orderly operation of a school.

(Def. Ex. D at 83 of 107).  As detailed below, the plaintiffs claim that MG was bullied while he

was in the fourth, fifth and sixth grades at the School.

During the time when MG was a student at Brooke East Boston, the School had a bullying prevention plan that had been submitted to and approved by the state.  (DF ¶ 14; Def. Ex. A at 145).  As described above, Ms. Dudley had primary responsibility for investigating complaints of bullying and harassment at the School.  She also prepared reports of her investigations, submitted them to the School's Principal or one of the Vice Principals and, depending upon the circumstances, worked with the Principal or Vice Principal to determine a response.  (See Pl. Ex. 4 at 27, 29-30, 40-42).  The plaintiffs assert that the School's implementation of its bullying prevention plan was inadequate because Ms. Dudley and other members of the School's administration had too much discretion to determine whether a student's conduct constituted bullying and what responses were appropriate.  (PR ¶¶ 12, 14).

**Alleged Incidents of Bullying During MG's Fourth Grade School Year (2015-2016)**

The plaintiffs' claims in this action arise out of incidents that began when MG was in the fourth grade at the School.  The first of these incidents began when one of MG's fourth grade classmates, MV, tripped MG during school and MG responded by calling MV "dumb."  (PR ¶ 23).  This would prove to be the first of several conflicts between MV and MG during MG's enrollment at Brooke East Boston, and it resulted in MG receiving a Community Violation.  (Id. ¶¶ 23, 27; DF ¶ 23).  On August 28, 2015, Ms. Grace sent an email to Mr. Clark in which she expressed concern that, contrary to the School's version of the incident, MV had acted intentionally when he tripped MG.  (DF ¶ 23; Def. Ex. G).  She also informed Mr. Clark that MV had pushed and tripped MG on two additional occasions, but the School had failed to investigate the matter until Ms. Grace complained to the Principal, Ms. Cole, and Ms. Cole assured her that Ms. Dudley would look into the issue.  (Def. Ex. G).

In response to Ms. Grace's email, Mr. Clark contacted Ms. Cole, who told him that the matter had been investigated and addressed in a satisfactory way. (DF ¶ 24). Thus, it is undisputed that Ms. Dudley conducted an investigation and informed Ms. Grace that MV admitted to tripping MG on purpose. (Pl. Ex. 2 at 63-65). She also explained that MV would receive two Community Violations as a result of his improper conduct.[3] (Def. Ex. G). However, the parties dispute whether the conflict was addressed appropriately by the School. According to the defendants, the incident was properly investigated at the school level and appropriately deemed to be a "peer-to-peer conflict" rather than a "bullying" incident that required the submission of a written report to the state under the School's bullying prevention policies. (DF ¶¶ 26, 29; see also Def. Ex. A at 79-84). The plaintiffs dispute the defendants' characterization of the incident as a "peer-to-peer conflict" and contend that MV's behavior constituted "bullying" under Massachusetts law.[4] (PR ¶¶ 24, 26, 29). Additionally, while Ms. Grace conceded that the School ultimately took disciplinary action against MV, the plaintiffs take issue with its failure to perform an investigation until Ms. Grace complained, as well as its alleged

---

[3] The plaintiffs repeatedly argue that the defendants' failure to produce in discovery documentation reflecting the School's investigations into MG's and Ms. Grace's complaints of bullying undermines the defendants' assertions that investigations took place. (See, e.g., PR ¶¶ 26, 29, 80). However, the plaintiffs' own witnesses testified that such investigations occurred, and the plaintiffs have presented no evidence to the contrary.

[4] The plaintiffs dispute the defendants' description of the incidents involving MV and MG as "peer-to-peer conflict" and suggest that the defendants' reference to "conflicts" rather than "bullying" was intended to minimize the severity and pervasiveness of the alleged harassment against MG and to justify their failure to promptly investigate and punish MV's conduct toward MG. (See Pl. Opp. Mem. (Docket No. 58) at 1-2, 13-15). As described above, however, the record shows that the School investigated Ms. Grace's August 28, 2015 complaint about MV's conduct and disciplined MV for his behavior. Furthermore, as detailed below, the record shows that the School disciplined MV for other incidents involving physical altercations with MG

failure to protect MG from additional bullying and harassment by MV.  (See Pl. Ex. 2 at 63-65; PR ¶ 29).

MG claims that MV also bullied him by repeatedly calling him "the 'B' word, a girl and gay" during his fourth grade year, but there is no evidence that MG or Ms. Grace reported any of the name calling incidents to the School or that anyone in authority at the School was aware of these incidents.  (PR ¶ 29).  According to Mr. Clark, the only incidents that were brought to his attention while MG was in the fourth grade were the matters described in Ms. Grace's August 28, 2015, email.  (Def. Ex. A at 95).  While the email described several instances of pushing and tripping, it contained no references to name calling or other forms of verbal harassment.[5]  (Def. Ex. G).

### Alleged Incidents of Bullying During MG's Fifth Grade School Year (2016-2017)

MG entered the fifth grade at Brooke East Boston in the fall of 2016.  In an email to Mr. Clark dated November 2, 2016, Ms. Grace complained about an incident in which an unidentified teacher told MG that "they are not wasting [their] time on a child that [can't follow] direction[s.]"  (DF ¶ 32; PR ¶ 32; Def. Ex. I).  As Ms. Grace stated in her email, "[i]t's very disappointing to me that I send my son to a school [that] practices respect and strong discipline for the children but not the adults. (Teachers)."  (Def. Ex. I).  She also expressed dissatisfaction with Ms. Cole's response to the incident, which involved speaking with the teacher but no

---

[5] Although there is no further evidence of alleged bullying during MG's fourth grade year, it is undisputed that MG received a suspension from riding the bus because he was talking about another student and failed to follow the bus driver's directions.  (Def. Ex. H).  The suspension was effective for one day after which MG was allowed back on the bus.  (Id.).

further action.  (Id.).  Mr. Clark believed he would have called the Principal, Ms. Cole, to discuss the incident, but he had no memory of speaking about it to Ms. Grace.  (Def. Ex. A at 75).

The plaintiffs claim that the teacher's statement to MG confirms that the School included MG on what the plaintiffs describe as a "heavy hitter" list of students with disciplinary problems.  (PR ¶ 32).  They further suggest that the School created a bias against MG by distributing the list to its teachers and staff.  (See id.).  However, the record does not support the plaintiffs' characterization of the list or its negative use by the School.  The document that the plaintiffs refer to as the "heavy hitter" list consists of an untitled, confidential list of students that includes their grade and classroom teacher, their "[t]riggers," their behavioral issues and the "[a]ppropriate [r]esponse to behavior."  (Pl. Ex. 13).  The plaintiffs have not cited any evidence to show who received the list or that it was used for any improper purpose.  Nor have they presented any evidence to establish a connection between the list and the incident described by Ms. Grace in her November 2, 2016 email to Mr. Clark.  (See PF ¶ 32).

Another incident giving rise to the plaintiffs' claims in this action concerns MG's teacher, Jenna Nissan ("Ms. Nissan").  On December 9, 2016, Ms. Grace sent Mr. Clark another email in which she described the incident as follows:

> So student at the school (last year) started sending a rumor around that my son [MG] was gay or wanted to be a transgender.  This issue was just brought up again.  After him talking to the dean Ms. Dudley, he then went to the class and was questioned by his teacher about why [he] was in the office.  He told Ms. Nissan that kids called him names and he didn't care cause he's not gay nor does he want to be a transgender.  He went on with the day he came back to his desk, there's a book he read the back and it's about a transgender boy with a note stating that this is a book that is his choice on if he want to read it or not.

(Def. Ex. J).  The book, *Gracefully Grayson*, was in the libraries of all the Brooke Charter Schools and it provides a fictional account of a child who identifies as transgender.  (DF ¶ 37, 39; PR ¶

39).  It was not part of a sexual education or health education curriculum.  (DF ¶ 37; PR ¶ 37).

On a post-it note, which Ms. Nissan placed on the front of the book, Ms. Nissan wrote, "If you

want to read about this, just for interest! (If not, you can give it back to me)."  (Def. Ex. K).  She

also drew a heart and printed her name on the note.  (Id.).

      In her email to Mr. Clark, Ms. Grace complained that MG was only 10 years old and it

was not his teacher's place to recommend a book like *Gracefully Grayson* to her son.  (Def. Ex.

J).  She also complained that the incident made MG feel offended and upset, and that her effort

to discuss the matter with Ms. Cole had not been productive.  (Id.).  According to Ms. Grace,

Ms. Cole's only response to Ms. Nissan's conduct was, "I don't feel it came from a bad place."

(Id.).  This made Ms. Grace feel upset as well as angry and disrespected.  (Id.).

      MG was extremely ashamed and embarrassed by Ms. Nissan's decision to leave the

book on his desk.  (PR ¶ 37).  As his therapist subsequently reported in one of her Progress

Notes, "all the other kids were laughing and pointing at [MG] and he felt like he just wanted to

die."  (Pl. Ex. 15 at 5).  MG brought the matter to Ms. Dudley's attention.  (Pl. Ex. 4 at 134).

Because it was a teacher-related incident, Ms. Dudley reported it to the Principal or to one of

the School's Vice Principals.  (Id.).  The School has no written report of MG's complaint but Mr.

Clark testified that he talked to Ms. Nissan, who told him that she left *Gracefully Grayson* on

MG's desk because he "seemed down" about the rumors going around about his sexual

orientation and gender identity.  (PR ¶ 40; Def. Ex. A at 112-13).  She also told him that the

book was popular in her classroom and that several students had read it.  (Id. at 110-11).  After

hearing details from Ms. Nissan, Mr. Clark felt that no further action from him was warranted.

(Id. at 109).  Thus, it is undisputed that the School took no corrective action against Ms. Nissan and that nothing more was done to address this incident.  (Pl. Ex. 19 at Response No. 35).

A third incident, again involving an adult, took place on MG's bus and arose out of a conversation between the bus monitor, Anitra Reed ("Ms. Reed"), and a female student.  (DF ¶ 42).  The record establishes that Ms. Reed asked the student, within MG's earshot, whether she liked MG.  (Id.; Pl. Ex. 3 at 81).  The student replied that she did not like MG because everyone in the school thought he was loud and gay.  (Pl. Ex. 3 at 81-82).  Reportedly, Ms. Reed then told MG "to watch his flamboyant hands – the way he moves his hands and the way he talks[.]"  (Pl. Ex. 2 at 84).  The incident humiliated MG, who "stood down and stayed to [himself] in [his] seat."  (Pl. Ex. 3 at 82).

Ms. Dudley learned about the bus incident from MG or Ms. Reed and she performed an investigation into the circumstances surrounding the matter.  (Def. Ex. B at 79-81).  Although Ms. Dudley had trouble remembering the exact words used by the parties involved in the incident, she recalled that Ms. Reed had asked the female student if she liked MG, and the student's response was "[n]o because I think he's gay."  (Id. at 80).   She also recalled that Ms. Reed "went and told [MG] that[,]" but there is no evidence that Ms. Dudley or any other members of the School administration learned of any comments about MG's flamboyant hands or his manner of speaking.  (See id.).  According to Ms. Dudley, the School took no disciplinary action against the female student because her statement regarding MG's sexual orientation had not been directed at MG.  (See id. at 81).   It is also undisputed that the School took no corrective actions with respect to Ms. Reed.  (Pl. Ex. 18, Ans. No. 25).  Ms. Dudley did believe that she contacted Ms. Grace to inform her about the incident.  (Def. Ex. B at 83).

Two final incidents that occurred during MG's fifth grade year involved physical altercations between MG and MV.  The first altercation took place in January 2017, and occurred when the students encountered each other in the hallway at School.  (DF ¶ 45).  Both MG and MV received Community Violations as a result of the incident.  (Id.).  Additionally, the School worked with teachers and other staff members in an effort to limit the times when MG and MV were both present in the hallways and bathrooms, and informed the parents of both students about this strategy.  (Id.).  Prior to this incident, the School had put the two boys in separate classes due to their past conflicts.  (PR ¶ 45).

The second altercation between MG and MV occurred on January 17, 2017, when the students were outside during recess.  (DF ¶ 46; Pl. Ex. 2 at 111).  According to Ms. Grace, Ms. Dudley called to inform her that MV had hit MG in the head, and that MG had hit MV back while screaming, "I'm not scared of you."  (Pl. Ex. 2 at 111).  Ms. Dudley also informed her that both students were disciplined as a result of their conduct.  (Id. at 111-12).  Although MG was not hurt, Ms. Grace was dissatisfied with the School's response, and on January 19, 2017, she filed an Incident Report with the police.  (Id. at 112-13; Pl. Ex. 11 at 4).  The Report noted that "[p]rior to this incident, the victim has been verbally assaulted, threatened and has been called 'gay and a fag' by this same individual" and that Ms. Grace remained unhappy with the School's approach to the problem.  (Pl. Ex. 11 at 4).  It also provided that MG "did not complain of any injuries" and that "the school administrators would be informed that the police were notified

and would follow up on it." (Id.).  It is unclear what, if any, action the police took to follow up on Ms. Grace's complaint. [6]

The record shows that MG began seeing a Licensed Mental Health Counselor beginning in January 2017 and was diagnosed with "[m]ajor depressive disorder, single episode," post-traumatic stress disorder and anxiety disorder.  (Pl. Ex. 15 at 1-2).  During his therapy sessions, MG complained that he was bullied at school on a daily basis, with kids calling him names like "gay" and "faggot" and "body check[ing]" him in the school yard.  (Id. at 7, 13).  He also reported that his teachers ignored his complaints and punished him when he tried to defend himself.  (Id. at 13, 16-17, 21).  The therapist's notes indicate that MG's peers continued to harass him throughout the course of the school year by taunting him, calling him "gay" and making fun of him on social media, and that MG became increasingly withdrawn, depressed and anxious as a result of his experience at school.  (Id. at 16-17, 21, 24-26, 34).  According to Ms. Grace, MG complained about the name calling but the issue "just wasn't dealt with" or taken seriously by the School.  (See Pl. Ex. 2 at 222-23).

### Alleged Incidents of Bullying During MG's Sixth Grade School Year (2017-2018)

The final incidents giving rise to this action occurred during MG's sixth grade year at the School.  In September of that year, MG learned that a fellow student had called him "gay" and started a rumor that spread around the School.  (PR ¶ 50; Def. Ex. A at 95-96).  MG reported the

---

[6] The plaintiffs contend that the School received a copy of the January 19, 2017 police Incident Report, but have not cited to any evidence that supports their contention.  (See PR ¶ 49 (citing police Incident Report)).  The defendants contend that no such police Report was ever provided to the Brooke Charter Schools, but they have presented no records or testimony to support their assertion.  (See DF ¶ 49 (citing Response No. 16 to plaintiffs' Request for Admissions)).  Accordingly, it is not clear whether the School was aware of the Incident Report.

matter to Ms. Dudley, who conducted an investigation and learned that the name-calling had occurred while the other student was at summer camp. (Def. Ex. A at 95-96). Because the offending conduct had taken place outside of school, Ms. Dudley determined that the School had no grounds to take disciplinary action. (Def. Ex. B at 59-61). The plaintiffs disagree with Ms. Dudley's conclusion and assert that "[t]his name-calling is a qualifying bullying behavior under the [bullying prevention] Plan and law as out of school conduct that has in-school effect." (PR ¶ 50). They also challenge the School's failure to take steps "to support MG as a vulnerable student under its Plan[.]" (Id. ¶ 52).

Sometime thereafter, Ms. Reed overheard two upper grade students refer to MG as "skittles," a derogatory term for a gay individual. (DF ¶ 53). Ms. Reed brought the offending students to Ms. Dudley, who issued them detentions and notified their parents. (Id.). MG told his therapist that the incident made him feel like a "[p]iece of shit" because students who overheard the comments were laughing and making fun of him. (Pl. Ex. 16 at 24). He also told her that Ms. Reed made no attempt to stop the teasing and did not make the upper grade students apologize. (Id.).

Another incident, this one involving MG and one his peers, began during art class when MG and a classmate, ED, were involved in an argument over art supplies. (DF ¶ 60; Def. Ex. A at 124). At some point in the argument, MG said to the other boy in front of the class, "[t]hat's why nobody likes you and your girlfriend broke up with you." (Def. Ex. A at 124). ED began crying and MG received a detention. (Id.). A month later, in early November 2017, one of ED's cousins sent a text or posted a message threatening to harm MG. (Id.; Pl. Ex. 11 at 6). The threat was reported to the School and ED's cousin was suspended. (Def. Ex. A at 124).

However, the suspension did not resolve the matter.  According to MG, ED continued to harass

MG by following him around in school and expressing anger at MG for getting him and his

cousin in trouble.  (Pl. Ex. 3 at 114).  MG reported this behavior to Ms. Dudley who "corrected"

ED.  (Id.).  Neither ED nor his cousin bothered MG after Ms. Dudley intervened in the dispute.

(Id.).

The record establishes that MG became increasingly agitated, anxious and resistant to

attending school during the sixth grade.  (Pl. Ex. 16 at 5, 14, 26).  It further shows that MG's

disciplinary problems increased significantly, and that he received over one hundred

Community Violations for his behavior that year.  (Pl. Ex. 3 at 204-05).  Most of the Violations

were issued by MG's teacher, Katrina Freund ("Ms. Freund"), who claimed that MG initiated

confrontations with her, arrived late and talked during class, slapped his own head or the table

during class, repeatedly demanded permission to leave class to get water or use the restroom,

made disparaging remarks to other students, refused to obey his teachers' instructions and

made disrespectful comments to his teachers in front of the class.  (Id. at 205; Def. Ex. C ¶¶ 13,

15).  MG disputes Ms. Freund's description of his behavior and claims that some of the

discipline he received was unwarranted.  (Pl. Ex. 3 at 125-28).

MG also contends that he was treated improperly by Gilbert Cardwell ("Mr. Cardwell"),

a school culture aide[7] who worked at Brooke East Boston for a brief period in March and April

of 2018, and issued some Community Violations to MG.  (PR ¶ 55; Pl. Ex. 6 at 239-40; Pl. Ex. 3 at

128).  According to MG, Mr. Cardwell swore at him whenever he saw MG in the hallway or the

---

[7] The plaintiffs refer to the school culture aide as Mr. Caldwell.  (PR ¶ 55).  However, the evidence shows that the correct name is "Cardwell."  (Pl. Ex. 6 at 239; Pl. Ex. 3 at 128).

bathroom, telling MG to "hurry the F up." (Pl. Ex. 3 at 129-30). He also accused MG of playing in the bathroom and calling Mr. Cardwell "[s]weetie." (Id. at 128). Ms. Grace complained about Mr. Cardwell to Ms. Dudley and the matter was referred to an Assistant Principal, Ms. Kirby. (Pl. Ex. 2 at 147-48). Ms. Kirby told Ms. Grace that she would speak to Mr. Cardwell, but nothing more was done until the School learned that Mr. Cardwell had been swearing at other students and terminated his employment. (Id.; Pl. Ex. 3 at 129; Pl. Ex. 6 at 239-40).

The record demonstrates that Ms. Dudley organized meetings to address MG's behavioral issues and develop a behavior support plan. (DF ¶ 57). The participants included Ms. Dudley, Ms. Grace, the School Psychologist, Maria Cannavo, MG's personal therapist and the School Principal or an Assistant Principal. (DF ¶ 58). Ms. Grace consistently advocated for moving MG to a new classroom, away from Ms. Freund, but instead a decision was made to provide MG with a notebook so he could communicate his thoughts and concerns to Ms. Freund in writing. (Pl. Ex. 20; DF ¶ 59; PR ¶ 59). The notebook proved to be an ineffective means to facilitate communication between MG and his teacher or to address the problems he was having in school. (DF ¶ 59).

Toward the latter end of the school year, in May 2018, another incident occurred involving MV and MG. On May 17, 2018, MV was involved in a fight on the playground. (DF ¶ 62). It is undisputed that MG was not a participant in the fight but the facts as to what happened next are unclear. (See id.; PR ¶ 62). According to Mr. Clark, as a teacher was leading MV back into the School, MG approached MV, which made MV angry. (Def. Ex. A at 178-79). MV then attempted to "get[ ] at MG, but the teacher stood between them" and prevented any contact with the plaintiff. (Id. at 179-80). However, Ms. Dudley provided a slightly different

account of the situation.  According to Ms. Dudley, MV "put his hands on [MG]" as MV was

being led into the School.  (See Pl. Ex. 4 at 48).  The plaintiffs contend, based on Ms. Dudley's

account of the incident, that MV's contact with MG constituted bullying and that the School

failed to handle the situation appropriately.  (PR ¶¶ 62-64).  While it is undisputed that MV was

suspended from school for fighting with others, the plaintiffs claim that the "others" did not

include MG and that the School failed to discipline MV for his conduct toward MG.  (See DF ¶

64; PR ¶ 64).

The final incident that occurred during MG's sixth grade year at Brooke East Boston took

place on May 18, 2018 in MG's classroom, as MG's teacher, Ms. Freund, was distributing post-it

notes to the class.  (DF ¶ 65; PR ¶ 65).  The details of this incident are partially disputed.  Ms.

Freund claims that she had been tossing post-it notes to students who had none of their own so

they could make annotations as they were reading.  (Def. Ex. C ¶ 17).  When Ms. Freund arrived

at MG's desk, MG told her he did not want any post-it notes.  (Id.).  According to the teacher,

> I pointed out that he had none, and tossed a few onto his desk, as I had done
> with the previous ten or so students.  M.G. held up his hand to block the post-its
> and they hit his hand.  M.G. shouted "you threw post-its at me!"  I said "no I
> didn't" and continued to distribute the post-its.  I did not engage with him
> further, in order to continue the lesson, and the class then started to read.

(Id.).  Ms. Freund expressly denies that she threw post-it notes or anything else at MG, and

claims that the "Plaintiff's own actions of trying to block his desk after I tossed the post-it notes

caused the notes to come into contact with him."  (Id. ¶ 18).  The plaintiffs dispute Ms. Freund's

account of the incident.  They maintain that Ms. Freund threw the post-it notes at MG and hit

him intentionally.  (PR ¶¶ 65, 67; Pl. Ex. 2 at 162, 167; Pl. Ex. 21 at 1).  They further maintain

that the incident reflected the hostility that had developed between MG and his teacher.  (Pl. Ex. 2 at 162; Pl. Ex. 21 at 1).

Immediately following the post-it note incident, MG received permission from another teacher, Ms. Ruggeri, to leave his classroom and go to the bathroom.  (DF ¶ 66; PR ¶ 66). Instead of going to the bathroom, MG contacted his mother.  (Pl. Ex. 2 at 160-61; see also DF ¶ 68).  Ms. Grace arrived at the School where she spoke to Ms. Dudley and obtained permission to go to MG's classroom to speak with Ms. Freund.  (Pl. Ex. 2 at 160-62).  While Ms. Grace claims that she acted appropriately when she reached the classroom, the defendants insist that she began yelling at Ms. Freund at a volume that could be heard on other floors of the School. (PR ¶ 68; DF ¶ 69).  As described below, this incident led Mr. Clark to ban Ms. Grace from the School except under certain limited conditions.  It also led Ms. Grace to withdraw her children from Brooke East Boston.

Following her visit to the School, Ms. Grace filed a police report in which she complained that MG was being bullied again in school and accused Ms. Freund of assaulting her son with post-it notes.  (Pl. Ex. 11 at 8-9).  She also retained counsel to represent her and MG in their dispute against the defendants.  (PR ¶ 72).  On May 21, 2018, Ms. Grace delivered a Demand Letter to the School that had been drafted by her attorney.  (Id.).  Therein, plaintiffs' counsel described numerous instances in which MG had allegedly been "singled out and ... targeted by students, teachers, and administrators" at Brooke East Boston.  (Pl. Ex. 8 at 1-4).  He also accused the defendants of creating and perpetuating a hostile environment for MG, retaliating against MG for his complaints of bullying, and failing to protect MG "from constant barrage of physical and verbal abuse[.]"  (Id. at 4-5).  The Demand Letter contained a list of nine demands,

including but not limited to, the creation of an action plan to protect MG "from all the targeting, bullying, [and] retaliation as provided under the laws of Massachusetts." (Id. at 5). Plaintiffs' counsel asked the defendants to meet with him on May 23, 2018 "to discuss these demands and [their] safety plans, in writing, before [MG] returns to [School]." (Id. at 6). There is no indication that the parties met or that the School took steps to create a safety plan for MG.

Mr. Clark subsequently conducted an investigation regarding the post-it note incident and his findings were consistent with Ms. Freund's version of the facts. (See Def. Ex. A at 229-30). Thus, Mr. Clark determined that the post-it notes hit MG because he put his arms out over his desk when Ms. Freund tried to toss them onto the desk. (Id.; Def. Ex. O). Mr. Clark attempted to meet with Ms. Grace to discuss his findings, but after speaking with her lawyer, Ms. Grace declined to attend a meeting. (Def. Ex. A at 234; Pl. Ex. 2 at 172-74). Accordingly, Mr. Clark informed Ms. Grace of his findings in a letter dated May 23, 2018. (Def. Ex. O).

In a separate letter, which was also dated May 23, 2018, Mr. Clark notified Ms. Grace that she was "no longer allowed to come into the building at Brooke East Boston Charter School or on school property" except in an emergency or with Mr. Clark's express permission, and that her failure to adhere to these restrictions "will constitute a violation of this no trespass order (Mass. General Laws c. 266 Section 120)" and potentially lead to her arrest. (Def. Ex. P). As Mr. Clark explained in support of the "no trespass order," the School considered Ms. Grace's actions at the School on May 18, 2018 as "a major disruption to the school, and particularly to [MG]'s class." (Id.). He specifically accused her of "interrupting Ms. Freund's class while she was in the middle of a lesson," insisting that Ms. Freund leave the classroom to speak with her, and raising

her voice to tell Ms. Freund "that she was going to be fired such that students and teachers" could hear her throughout the third floor hallway.  (Id.).  Although Ms. Grace initially kept MG home from school after the post-it note incident because she wanted the School to provide him with a safety plan, she withdrew MG from the School and enrolled him elsewhere after receiving the no trespass order.  (Def. Ex. F at 193-94).

The plaintiffs claim that Mr. Clark's implementation of the no trespass order amounted to retaliation for Ms. Grace's actions in advocating for her son and retaining counsel to represent her in her disputes with the School.  (PR ¶ 74).  They also assert that Mr. Clark constructively expelled MG and one of his siblings, MG3, from Brooke East Boston by not responding to their counsel's demand for a safety plan for MG and "through the No Trespass Order issued to their mother for having retained counsel."  (PR ¶¶ 75-76).  According to the plaintiffs, Ms. Grace suffered a nervous breakdown, a panic attack at work, major depression, loss of income and an inability to care for her children as a result of the defendants' actions. (Id. ¶ 76).  They also claim that MG and MG3 "lost weeks of education" and that MG suffered emotional harm due to his experience at the School.  (Id.).  Specifically, the plaintiffs claim that MG experienced anxiety, depression and post-traumatic stress disorder as a result of the bullying, the *Gracefully Grayson* incident, name calling and "unfair targeting by students and teachers" at Brooke East Boston.  (PR ¶ 55).  Furthermore, they claim that MG has become distant and has lost interest in life as a result of the "three years of victimization ... by students, staff, administration and the Board" of the School.  (PR ¶ 76).

## Investigation by the Department of Elementary and Secondary Education

On June 21, 2018, Ms. Grace submitted a written complaint to the Massachusetts Department of Elementary and Secondary Education ("DESE") regarding alleged incidents of bullying that MG suffered during fourth, fifth and sixth grade.  (DF ¶ 77; PR ¶ 77).  In a letter dated July 17, 2018, DESE notified Mr. Clark and Ms. Steadman of the complaint and asked the School to provide a report on the following three instances of alleged bullying against MG: (1) the January 2017 altercation between MV and MG during recess; (2) the November 2017 message from ED's cousin threatening MG with physical harm; and (3) the alleged assault against MG by his sixth grade teacher, Ms. Freund, on May 18, 2018.  (Def. Ex. Q).  Mr. Clark responded to DESE's letter on August 9, 2018.  (Def. Ex. R).  Therein, Mr. Clark described the findings of his own investigation into the incidents highlighted in DESE's letter, as well as a number of additional incidents of alleged bullying involving MG.  (Id.).  He also described the scope of his investigation, referenced documents relating to his investigation, and summarized the School's response to each of the incidents at issue.  (Id.).  As Mr. Clark stated in relevant part in his letter,

> [MG] was indeed involved in multiple disciplinary incidents during the year, some of which involved wrongs being done to him and some of which involved him doing wrongs to others.  In the cases in which wrongs were committed, consequences were administered to those students.  None of those incidents involved a "repeated use by one or more students or by a member of a school staff ...... of a written, verbal, or electronic expression or a physical act or gesture or any combination thereof, directed at a target ..." as bullying is defined in MGL c. 71, § 37O.  That standard is in fact impossible to meet given that each of the incidents described in the complaint names different individuals and different circumstances.

(Id. at 1-2).  The plaintiffs submitted a response, which DESE reviewed along with the original complaint and Mr. Clark's written submission.  (See Def. Ex. S at 1).  DESE also spoke to both

parties, considered documentation that was submitted by the School and reviewed relevant state and federal laws and regulations.  (Id.).

On September 14, 2018, DESE issued a letter describing the findings of its investigation of the plaintiffs' complaint.  (Def. Ex. S).  Therein, DESE explained that it investigated the three instances of alleged bullying that were described in its July 17, 2018 letter to Mr. Clark and Ms. Steadman, and considered the plaintiffs' allegations under the Massachusetts anti-bullying statute, Mass. Gen. Laws ch. 71, § 37O.  (Id. at 2).  It further stated that "[i]n all three instances, the school administrators did conduct an investigation of bullying[,]" concluded that "bullying had not occurred and took protective measures to prevent further instances."  (Id. at 4).  According to DESE, Brooke East Boston complied with Mass. Gen. Law ch. 71, § 37O and, based on the information gathered, "no violation of education law, regulation or policy has occurred with regard to the specific concerns raised."  (Id. at 5).  The plaintiffs assert that "DESE's conclusions were based on its review of three items out of many allegations contained in a 17 page complaint" and that the defendants have violated applicable law.  (PR ¶ 79).  Accordingly, on April 1, 2019, the plaintiffs filed their Complaint against the defendants in the instant action.

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.    ANALYSIS

#### A.  Summary Judgment Standard of Review

The defendants have moved for summary judgment on all of the plaintiffs' claims. Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party[.]'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)). "[A] fact is 'material' if it 'has the potential of affecting the outcome of the case." Id. (quoting Perez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

When a properly supported motion for summary judgment is presented, the non-moving party can avoid summary judgment only by providing properly supported evidence of a genuine dispute about material facts. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018). Accordingly, "the nonmoving party must ... 'set forth specific facts showing that there is a genuine issue for trial[.]'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In evaluating a motion for summary judgment, the Court must review the record "in a light most favorable to the non-moving party[.]" Lima v. City of E. Providence, 17 F.4th 202, 206 (1st Cir. 2021). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Popular Auto, Inc. v. Reyes-Colon (In re Reyes-Colon), 922 F.3d 13, 20 (1st Cir. 2019) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

B. **Count I: Claims for Violations of Title IX**

In Count I of their Complaint, the plaintiffs are seeking to hold the defendants liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, for failing to

investigate, report and protect MG from harassment and discrimination based on perceptions

of his sexual orientation and/or gender identity.  The defendants argue that they are entitled to

judgment as a matter of law on Count I because the School's reasonable responses to the

plaintiffs' claims of harassment preclude a finding that the defendants were deliberately

indifferent to known acts of sexual harassment, and because the undisputed facts fail to

establish that MG was targeted "based on sex," as required to maintain a claim under Title IX.

(Def. Mem. (Docket No. 51) at 7-14).  While this court finds that the question whether the

defendants are entitled to summary judgment on one or both of these grounds is a close one,

this court concludes that these matters are best resolved by a factfinder at trial.  Therefore, this

court recommends that the defendants' motion for summary judgment be denied with respect

to Count I of the Complaint.

 "Title IX prohibits gender-based discrimination in a wide array of programs and activities

undertaken by educational institutions."  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st

Cir. 2002).  It provides that '[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance.'"  Morgan v.

Town of Lexington, MA, 823 F.3d 737, 744 (1st Cir. 2016) (quoting 20 U.S.C. § 1681(a)).  "The

statute's enforcement machinery includes an implied private right of action through which an

aggrieved party may seek money damages ... against the educational institution itself."  Frazier,

276 F.3d at 65.  In the instant case, the plaintiffs have asserted claims against Brooke East

Boston, its Board of Trustees and its fundraising entity based on hostile environment sexual harassment.[8]

"In general, a hostile environment claim under Title IX requires acts of sexual harassment that are so severe and pervasive as to interfere with the educational opportunities normally available to students." Santiago v. P. R., 655 F.3d 61, 73 (1st Cir. 2011).  To prevail on such a claim, the plaintiffs "must show (1) that [MG] was a student, who was (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." Frazier, 276 F.3d at 66.  "To satisfy the fifth part of this formulation, the plaintiffs must prove that a school official authorized to take corrective action had actual knowledge of the harassment, yet exhibited deliberate indifference to it." Id.  In this case, the defendants argue that the record is inadequate to raise a genuine issue of material fact with regard to the third and fifth elements of the plaintiffs' Title IX claim.  (Def. Mem. at 7-14).  This court disagrees for the reasons that follow.

Deliberate Indifference

Addressing the fifth element first, "[t]he deliberate indifference standard has considerable bite.  It demands that a funding recipient be shown to have had actual knowledge of the harassment." Santiago, 655 F.3d at 73.  In addition, a funding recipient will only be liable if "its deliberate indifference 'subject[s]' its students to harassment.  That is, the deliberate

---

[8] "Two types of harassment are actionable under Title IX: quid pro quo harassment and hostile environment harassment." Santiago v. P. R., 655 F.3d 61, 73 (1st Cir. 2011).  As the plaintiffs have stated in their opposition to the motion for summary judgment, MG's Title IX claims are based on a theory of "hostile environment sexual harassment."  (Pl. Opp. Mem. (Docket No. 58) at 9).

indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 645, 119 S. Ct. 1661, 1672, 143 L. Ed. 2d 839 (1999) (alterations in original) (quoting Random House Dictionary of the English Language 1415 (1966) and Webster's Third New International Dictionary 2275 (1961)). "If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment.  Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability." Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999).

The fact that a funding recipient may face liability for deliberate indifference to known acts of sexual harassment "does not mean ... that administrators must engage in particular disciplinary action." Davis, 526 U.S. at 648, 119 S. Ct. at 1173-74.  On the contrary, the Supreme Court has cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Id. at 648, 119 S. Ct. at 1674.  In order for school administrators to "continue to enjoy the flexibility they require" to address sexual harassment in schools, funding recipients will be deemed "'deliberately indifferent' to ... harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id.  Accordingly, "a court's proper inquiry" in a Title IX case against an educational institution "is limited to whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 175 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009).

Application of the Deliberate Indifference Standard to the Instant Case

The plaintiffs claim that the defendants were deliberately indifferent to known instances of sexual harassment against MG because they failed to adequately investigate and address multiple instances in which MV and other students referred to MG using offensive, homophobic language such as "gay," "transgender" and "skittles"; the incident in which Ms. Nissan left a copy of *Gracefully Grayson* on MG's desk; and the bus incident during which Ms. Reed allegedly counseled MG to watch his "flamboyant hands" and "the way he talks."  (See Pl. Opp. Mem. (Docket No. 58) at 13-21).  Because a rational factfinder, viewing the record in the light most hospitable to the plaintiffs and drawing all reasonable inferences in their favor, could conclude that the School's response to harassment based on MG's sexual orientation and gender identity was clearly unreasonable in light of the circumstances known by the School's administrators, this court finds that the question of deliberate indifference should be resolved at trial.

The evidence shows that beginning in fourth grade, MV began calling MG names such as "bitch," "gay" and "girl."  (See PR ¶ 29).  It also indicates that the verbal harassment increased and became more widespread while MG was in fifth grade.  In particular, the record demonstrates that during the first half of MG's fifth grade school year, his peers were referring to him as "gay" or "transgender," and by about mid-March 2017, a group of boys and even some girls were taunting and harassing MG on a daily basis by calling him names such as "gay" and "faggot," and "body check[ing]" him in the school yard.   (Def. Ex. J; Pl. Ex. 15 at 3, 7, 13). The harassment spread to social media, continued throughout MG's fifth grade year and persisted during MG's sixth grade year.  (Pl. Ex. 16 at 21, 24, 26; DF ¶ 53).  By then, MG was targeted not only by his peers, but also by students in an upper grade as well.  (DF ¶ 53).

The evidence further demonstrates that by the middle of MG's fifth grade year, when the name calling began to intensify to the point where it became a daily occurrence, Mr. Clark and Ms. Dudley learned about the verbal harassment from MG, Ms. Grace and some of the School's teaching staff. (See Def. Ex. J; Pl. Ex. 3 at 79-80; Def. Ex. B at 79-81). Ms. Dudley also knew that the name calling continued when MG was in the sixth grade. (See Def. Ex. A at 95-96; Def. B at 59-61; DF ¶ 53). It undisputed that Ms. Dudley investigated only three of the name calling incidents – two in which students called MG "gay" and one in which older students referred to MG as "skittles." (See Def. A at 95-96, 112-13; Def. Ex. B at 59-61; 79-81; DF ¶ 53). With the exception of the "skittles" incident in which Ms. Dudley issued detentions to the perpetrators, there is no evidence that the School took concrete steps to stop the harassment or protect MG from ongoing harassment. The record, when viewed in the plaintiffs' favor, indicates that the School's administrators refused to address the situation directly or discipline the students involved because they did not take the verbal harassment seriously. (See Pl. Ex. 2 at 221-25). Under the law of the First Circuit, "a school might be deliberately indifferent to ... sexual harassment of a student where it had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." Porto v. Town of Tewksbury, 488 F.3d 67, 73-74 (1st Cir. 2007). Accordingly, a rational factfinder could conclude that the defendants' conduct was "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648, 119 S. Ct. at 1174. See also Harrington v. City of Attleboro, 172 F. Supp. 3d 337, 345 (D. Mass. 2016) (finding that plaintiffs plausibly alleged deliberate indifference where harassment consisting of name calling by plaintiff's peers continued over the course of four years).

28

The defendants assert that "rumors" of peer-to-peer name calling are insufficient to support a claim that the School was deliberately indifferent because "[t]he existence of 'rumors' by their nature are nearly impossible to investigate," and Ms. Dudley did investigate reports of specific instances where certain students referred to MG using anti-homosexual epithets.  (Def. Reply Mem. (Docket No. 59) at 4).  However, Ms. Grace testified that MG was reporting the incidents of verbal harassment and that School administrators did know the source of the rumors but were choosing not to address them.  (Pl. Ex. 2 at 222).  She further noted that there were actions the School could have taken, such as sending a letter to the parents or providing students with a course on discrimination.  (Id. at 222-23).  Because this testimony raises questions concerning the nature and extent of the School's actual knowledge, as well as the reasonableness of its response, the issue of deliberate indifference should be resolved by a factfinder at trial.

This court also finds that when the evidence is viewed in the light most favorable to the plaintiffs, a rational factfinder could conclude that incidents involving Ms. Nissan and Ms. Reed contributed to the ongoing harassment of MG based on his sexual orientation and gender identity, and that the School's failure to take some form of corrective action to address their conduct further supports the plaintiffs' claim of deliberate indifference.  As MG informed his therapist when discussing the incident in which Ms. Nissan left the *Gracefully Grayson* book on his desk, "all the other kids were laughing and pointing at him and he felt like he just wanted to die."  (Pl. Ex. 15 at 5).  MG's mother also testified that the incident "broke him" and "was just too much" for MG to handle.  (Pl. Ex. 2 at 94-95).  Thus, when the incident is viewed in the context of the ongoing harassment against MG by his peers, a reasonable juror could find that

Ms. Nissan's conduct, no matter how innocent or well intended, perpetuated an ongoing pattern of harassment against MG, and that the School's decision to take no action beyond an investigation was unreasonable and constituted deliberate indifference to known acts of sexual harassment.

The circumstances relating to the bus incident support a similar conclusion.   As in the case of the *Gracefully Grayson* incident, there is no genuine dispute that MG was humiliated by Ms. Reed's actions in initiating a conversation on the bus in which a fellow student said everyone thought MG was "loud and gay." (See Pl. Ex. 3 at 82).  While there is no evidence that Ms. Reed's subsequent instruction to MG to "watch his flamboyant hands" and the way he talks was ever reported to Ms. Dudley or others in authority at the School, Ms. Dudley was aware that Ms. Reed had, at a minimum, continued to discuss the student's comment with MG while the children were still on the bus.  (See Def. Ex B at 80-83).  A reasonable factfinder viewing this incident in light of the ongoing pattern of verbal harassment against MG could conclude that Ms. Reed's actions exacerbated the problem, and that the School's failure to take any corrective measures provides further support for a finding of deliberate indifference against the defendants.

Finally, a rational factfinder could conclude that the School acted with deliberate indifference by refusing to transfer MG out of Ms. Freund's sixth grade class despite Ms. Grace's repeated requests for a transfer and Ms. Freund's hostility toward MG.  The record demonstrates that MG had a troubled relationship with Ms. Freund, which resulted in frequent detentions and suspensions in addition to the nearly 100 Community Violations that Ms. Freund issued to MG throughout the year.  (See Pl. Ex. 16 at 11; Pl. Ex. 3 at 204-05).  It also

demonstrates that MG's classroom behavior deteriorated to the point where MG's personal therapist began to attend meetings with MG, his family and School officials to discuss a behavior support plan.  (Pl. Ex. 16 at 11; DF ¶¶ 57-58).  Although MG's therapist expressed concern to School officials about "ongoing issues of bullying by other[ ] students" and the School's failure to help MG, her notes indicate that MG's classroom environment remained hostile and that he continued to experience harassment and bullying at school.  (Pl. Ex. 16 at 11, 14, 18, 22-24).  A rational factfinder could conclude from these facts that the School's failure to transfer MG out of Ms. Freund's class caused him to endure a hostile educational environment that left him vulnerable to further harassment from his peers, and that the defendants' conduct was "clearly unreasonable" in the context of ongoing harassment. Fitzgerald, 504 F.3d at 175.  Therefore, the plaintiffs have presented disputed issues of fact that are sufficient to defeat summary judgment on the issue of deliberate indifference.

Existence of Harassment "Based on Sex"

The defendants also argue that they are entitled to summary judgment on the plaintiffs' Title IX claims because the record contains no evidence of harassment "based on sex."  (Def. Mem. at 10-14).  In particular, the defendants emphasize that mere teasing and name calling using objectionable epithets such as "gay" and "skittles" or phrases "tinged with sexual connotations" is not enough to support a claim under Title IX, and that the plaintiffs' failure to present evidence of sexual harassment beyond taunting and name calling warrants judgment as a matter of law in their favor.  (Id. at 11-12, 14).  Although this issue is a close one, this court finds that the question whether MG suffered harassment based on sex should be determined at trial.

"Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case[.]" Frazier, 276 F.3d 52, 66.  Thus, "[t]o constitute sex-based discrimination under Title IX, the alleged name calling, comments and [any] physical assault of [MG] by [his] peers must have been because of [his] sex." Harrington, 172 F. Supp. 3d at 344 (internal citations omitted).  To satisfy this requirement, "[i]t is not enough to show ... that a student has been teased or called offensive names." Davis, 526 U.S. at 652, 119 S. Ct. at 1675 (quotations, citations and punctuation omitted).  Nevertheless, courts in this district have determined that "sex based discrimination can be based on sex stereotypes." Harrington, 172 F. Supp. 3d at 344, and cases cited.  Accordingly, harassment arising from "the perpetrators' sex-based stereotypes of masculinity ... is actionable under Title IX." Snelling v. Fall Mountain Reg'l Sch. Dist., No. 99-448-JD, 2001 WL 276975, at *4 (D.N.H. Mar. 21, 2001).

The evidence presented on summary judgment supports an inference that the verbal harassment MG endured arose from sexual stereotyping.  In other words, a rational factfinder could infer "that [MG], whether because of [his] physical appearance, mannerisms or sexual preference, did not conform to certain [male] stereotypes[,] rather than because of some other characteristic that is not protected by Title IX." Harrington, 172 F. Supp. 3d at 344.  Specifically, it is undisputed that MV called MG a "bitch" and a "girl" among other names, thereby suggesting that MG's characteristics were being viewed as inconsistent with stereotypical male characteristics.  (See PR ¶ 29).  It is also undisputed that MG's fellow students accused him of wanting to be transgender, and that Ms. Nissan thought MG would benefit by reading a book about a child who identifies as transgender.  (See Def. Ex. J).  In addition, the plaintiffs have presented evidence showing that Ms. Reed told MG "to watch his flamboyant hands" and "the

32

way he talks" during the incident on the bus, and that Mr. Cardwell accused MG of calling him "[s]weetie." (Pl. Ex. 2 at 84; Pl. Ex. 3 at 128). These facts suggest that the taunting and name calling was "not simply 'tinged with offensive sexual connotations,'" but "'constitute[d] discrimination because of sex.'" Harrington, 172 F. Supp. 3d at 344 (internal quotations, punctuation and emphasis omitted) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). Therefore, the defendants have not shown that they are entitled to relief on this basis and their motion for summary judgment should be denied with respect to the Title IX claims. See Snelling, 2001 WL 276975, at *4 (denying defendants' motion for summary judgment where plaintiffs argued that name calling, taunting and abusive behavior "arose from the perpetrators' sex-based stereotypes of masculinity" and could therefore support a claim under Title IX).

C. **Counts II-III: Claims for Violation of MG's Right to Equal Protection**

In Counts II and III of their Complaint, the plaintiffs have asserted claims against the defendants, pursuant to 42 U.S.C. § 1983 ("§ 1983"), for violations of MG's Fourteenth Amendment right to equal protection. Specifically, in Count II, the plaintiffs claim that the defendants failed "to protect the minor Plaintiff MG and other members of protected class of students from the acts of sexual, sexual-orientation, gender-identity abuses included but not limited to verbal harassment because of sex, gender, sexual orientation, gender-identity bias and discrimination." (Compl. (Docket No. 1-2) ¶ 95). In Count III, the plaintiffs are seeking to hold the defendants liable under a "class-of-one" equal protection theory, claiming that MG was "intentionally treated differently than other students similarly situated in his 4th, 5th and 6th grade classes." (Id. ¶¶ 100-01). The defendants argue that they are entitled to summary

judgment on these claims because the plaintiffs have failed to identify any similarly situated

persons who were treated differently than MG, and because class-of-one equal protection

claims are inapplicable to discretionary governmental decisions such as decisions regarding

student discipline and investigations into school code of conduct violations.  (Def. Mem. at 15-

17).  Additionally, the defendants argue that under Section 1983, they cannot be held

vicariously liable for the unconstitutional acts of the School's officials or employees in the

absence of an unconstitutional custom or policy, and the plaintiffs have failed to allege facts,

much less present evidence, showing that any such custom or policy existed at the School.  (Id.

at 18-19).  This court finds that the plaintiffs' failure to identify similarly situated students who

were treated differently than MG is fatal to their equal protection claims.  This court also finds

that the plaintiffs are precluded from holding the named defendants liable under Section 1983

for the actions of School officials and employees due to their failure to identify an

unconstitutional custom or policy.  Accordingly, this court recommends that the defendants'

motion for summary judgment be allowed with respect to the equal protection claims.

<u>Failure to Identify Similarly Situated Students</u>

"The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating

similarly situated persons differently because of their classification in a particular group."

<u>Mulero-Carrillo v. Roman-Hernandez</u>, 790 F.3d 99, 105-06 (1st Cir. 2015).  Thus, "[a]n equal

protection claim requires 'proof that (1) the person, compared with others similarly situated,

was selectively treated; and (2) that such selective treatment was based on impermissible

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional

rights, or malicious or bad faith intent to injure a person.'"  <u>Freeman v. Town of Hudson</u>, 714

F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995)).

"Typically, a plaintiff asserting an Equal Protection Clause violation 'must identify his putative

comparators' to make out a threshold case of disparate treatment.'" Harrington, 172 F. Supp.

3d at 346 (alteration omitted) (quoting Doe v. Town of Stoughton, No. 12-cv-10467-PBS, 2013

WL 6498959, at *2 n.3 (D. Mass. Dec. 10, 2013)).  Under an ordinary equal protection claim,

"[t]he standard for determining whether individuals are similarly situated 'is whether a prudent

person, looking objectively at the incidents, would think them roughly equivalent and the

protagonists similarly situated.'" Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 223 (D.

Mass. 2015) (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7

(1st Cir. 2001)).  Where the equal protection claim is based on a class-of-one theory, the

"plaintiff bears the burden of showing that his comparators are similarly situated in all respects

relevant to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d

634, 639-40 (1st Cir. 2013).  "While the applicable standard does not require that there be an

'[e]xact correlation,' there must be sufficient proof on the relevant aspects of the comparison

to warrant a reasonable inference of substantial similarity." Cordi-Allen v. Conlon, 494 F.3d

245, 251 (1st Cir. 2007) (alteration in original) (quoting Tapalian v. Tusino, 377 F.3d 1, 6 (1st Cir.

2004)).

 In the instant case, the plaintiffs have failed to identify, either in their Complaint or in

their opposition to the motion for summary judgment, a group of similarly situated students.

Although the plaintiffs make references in their Complaint to "other members of protected

class of students" and "other students similarly situated in [MG's] 4th, 5th and 6th grade

classes," they have not alleged any facts showing how MG was part of a protected class or

identifying how other students were similarly situated.  (See Compl. ¶¶ 92-105).  Similarly, the plaintiffs argue in opposition to the defendants' summary judgment motion that MG was part of a "vulnerable population[ ]" of students "in the School Community" but they fail to describe the nature and scope of that population.  (Pl. Opp. Mem. at 22-23).  They also argue that the School treated MG differently than "other students" and MG's "classmates" without any attempt to identify the students at issue or to describe how those students were similarly situated to MG.  (Id. at 23).  The plaintiffs' failure to identify the putative comparators or to present facts establishing MG's similarity to those comparators warrants a judgment in the defendants' favor on both of the equal protection claims.  See Gianfrancesco, 712 F.3d at 640 (dismissing class-of-one equal protection claim where plaintiff identified only one putative comparator and made no effort to establish how or why his business was similarly situated to that comparator "in any relevant way"); Pollard, 132 F. Supp. 3d at 223 (dismissing both ordinary equal protection claim and class-of-one equal protection claim where plaintiff alleged that school district "afforded [the minor plaintiff] a lower level of protection compared to 'other students,'" but never alleged "any facts to establish that these students are similarly situated.").

### Failure to Present Evidence of Unconstitutional Custom or Policy

Even if the plaintiffs had presented sufficient evidence of comparators to withstand summary judgment on their equal protection claims, those claims would still fail to pass muster under § 1983.  In this case, the plaintiffs are attempting to hold public entities liable for the alleged unconstitutional acts of their employees at Brooke East Boston.  However, "[t]here is no liability on a theory of a *respondeat superior*" in a case brought under § 1983.  Andrew S. ex rel.

Margaret S. v. Sch. Comm. of the Town of Greenfield, Mass., 59 F. Supp. 2d 237, 246 (D. Mass. 1999).  "It is well-established that 'only those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable.'"  Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir. 2006) (quoting Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005)). Where, as here, plaintiffs have brought suit against a supervisory entity instead of the individuals whose conduct allegedly caused the harm, the plaintiffs must show that the deprivation of constitutional rights "occurred as a product of a custom and policy" of the supervisory entity.  Andrew S. ex rel. Margaret S., 59 F. Supp. 2d at 246.

No such showing has been made in the instant case.  The plaintiffs have neither alleged nor argued that the conduct at issue occurred pursuant to a custom or policy at Brooke East Boston.  (See Compl. at Counts II-III; Pl. Opp. Mem. at 25).  To the extent they argue that the so-called "heavy hitters list" of students with disciplinary problems at the School was part of an official policy, they have not presented any facts to support such a claim.  (See Pl. Opp. Mem. at 25).  Nor have they explained how MG's inclusion on that list resulted in the deprivation of his constitutional rights.  (See id.).  Therefore, this court concludes that the defendants are entitled to summary judgment on Counts II and III of the Complaint for this reason as well.

D. **Count IV: Claims for Denial of Equal Rights**

In Count IV of the Complaint, the plaintiffs are seeking money damages from the defendants for violations of MG's rights under the Equal Rights Amendment ("ERA") to the Massachusetts Declaration of Rights and Mass. Gen. Laws ch. 76, § 5.  Specifically, the plaintiffs claim that Brooke East Boston, its Board of Trustees and the Brooke School Foundation, Inc. discriminated against MG on the basis of his perceived sexual orientation and gender identity,

37

thereby denying him the rights afforded to him under the ERA and Chapter 76 § 5.  The

defendants argue that these claims are barred by the plaintiffs' failure to comply with the

applicable exhaustion requirement.  (Def. Mem. at 19-21).  They further argue that they are

entitled to immunity from these claims pursuant to § 10(j) of the Massachusetts Tort Claims Act

("MTCA").  (Id. at 21-22).  This court finds that summary judgment is warranted on the basis of

immunity and that it is unnecessary to address the issue of exhaustion.

<u>Nature of the Plaintiffs' Discrimination Claim</u>

The Massachusetts ERA provides in relevant part that "[e]quality under the law shall not

be denied or abridged because of sex, race, color, creed, or national origin."  Mass. Const. pt. 1,

art. 1.  Chapter 76, § 5, which specifically prohibits discrimination in public education, provides

in relevant part that "[n]o person shall be excluded from or discriminated against in admission

to a public school of any town, or in obtaining the advantages, privileges and courses of study

of such public school on account of race, color, sex, gender identity, religion, national origin or

sexual orientation."  Mass. Gen. Laws ch. 76, § 5.  The Supreme Judicial Court of Massachusetts

("SJC") has assumed "that on this subject the statute equates with [the] ERA[.]"  <u>Att'y Gen. v.</u>

<u>Mass. Interscholastic Athletic Ass'n, Inc.</u>, 378 Mass. 342, 344 n.5, 393 N.E. 2d 284, 286 n.5

(1979).  It has also held that Mass. Gen. Laws ch. 76, § 16, entitled, "Children excluded from

school; remedies," "provides the exclusive remedy for a pupil seeking damages in tort, when a

member of the school committee, principal, or teacher unlawfully excludes a pupil from a

public school" or otherwise violates Chapter 76, § 5.[9]  <u>Doe v. D'Agostino</u>, 367 F. Supp. 2d 157,

---

[9] Mass. Gen. Laws ch. 76, § 16 provides that, "[a]ny pupil who has attained age eighteen, or the parent,
guardian or custodian of a pupil who has not attained said age of eighteen, who has been refused
admission to or excluded from the public schools or from the advantages, privileges and courses of

178 (D. Mass. 2005) (concluding that plaintiffs seeking damages against teacher and school officials based on teacher's alleged abuse of fifth grade student should have brought suit under section 16 of Chapter 76 rather than under section 5 of the statute).  Therefore, the issue before this court is whether, under Mass. Gen. Laws ch. 76, § 16, the plaintiffs may pursue claims for damages against the defendants.  This court concludes that the MTCA precludes them from doing so.

### Immunity Under Section 10(j) of the Massachusetts Tort Claims Act

Pursuant to section 2 of the MTCA, "public employers are liable for negligent or wrongful acts or omissions of public employees acting within their scope of employment." Cormier v. City of Lynn, 479 Mass. 35, 39, 91 N.E.3d 662, 665 (2018) (citing Mass. Gen. Laws ch. 258, § 2).[10]  It further provides that "[t]he remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer[.]"  Mass. Gen. Laws ch. 258, § 2.  Accordingly, "the act is the exclusive remedy for bringing tort claims against the Commonwealth and its municipalities[.]" Magliacane v. City of Gardner, 483 Mass. 842, 850, 138 N.E. 3d 347, 356 (2020).  This would include a claim under Mass. Gen. Laws ch. 76, § 16.  See D'Agostino, 367 F. Supp. 2d at 178 (applying the MTCA to a

---

study of such public schools shall on application be furnished by the school committee with a written statement of the reasons therefor, and thereafter, if the refusal to admit or exclusion was unlawful, such pupil may recover from the town or, in the case of such refusal or exclusion by a regional school district from the district, in tort and may examine any member of the school committee or any other officer of the town or regional school district upon interrogatories."

[10] Mass. Gen. Laws ch. 258, § 2 provides, in relevant part, that, "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances[.]"

claim against a municipal defendant for violations of a student's rights under Mass. Gen. Laws
ch. 76, § 16).

Section 10 of the MTCA, "sets forth several exceptions to [the] general waiver of
sovereign immunity" provided under section 2 of the statute.  Cormier, 479 Mass. at 39, 91 N.E.
2d at 665.  Section 10(j), the provision on which the defendants rely in this case, "bars 'any
claim based on an act or failure to act to prevent or diminish the harmful consequences of a
condition or situation, including the violent or tortious conduct of a third person, which is not
originally caused by the public employer or any other person acting on behalf of the public
employer.'"  Id. at 39, 91 N.E. 3d at 665-66 (footnote omitted) (quoting Mass. Gen. Laws ch.
258, § 10(j)).  "In other words, § 10(j), which 'was intended to provide some substantial measure
of immunity from tort liability' to public employers, eliminates government liability for a public
employer's act or failure to act to prevent harm from the wrongful conduct of a third party
unless the condition or situation was 'originally caused' by the public employer."  Id. at 40, 91
N.E.3d at 666 (footnote omitted) (emphasis in original) (quoting Brum v. Dartmouth, 428 Mass.
684, 692, 695, 704 N.E.2d 1147 (1999)).  "In the school bullying context, courts have dismissed
claims against a school for its failure to prevent or address peer-to-peer bullying and
harassment where the school cannot be considered the 'original cause' of plaintiff's injury."
Harrington, 172 F. Supp. 3d at 349 (citing cases).

The plaintiffs argue that the School's decision not to investigate repeated instances of
name calling and harassment was the "original cause" of MG's harm in this case.  (Pl. Opp.
Mem. at 26-27).  However, the SJC has "construed the 'original cause' language to mean an
affirmative act (not a failure to act) by a public employer that creates the 'condition or

40

situation' that results in harm inflicted by a third party." Kent v. Commonwealth, 437 Mass.

312, 318, 771 N.E.2d 770, 775 (2002) (quoting Brum v. Dartmouth, 428 Mass. 684, 695, 704

N.E.2d 1147 (1999)). Accord Cormier, 479 Mass. at 40, 91 N.E.3d at 666 ("To have 'originally

caused' a condition or situation for the purposes of § 10(j), the public employer must have

taken an affirmative action; a failure to act will not suffice." (footnote omitted)). Accordingly,

the School's failure to investigate or otherwise address reported incidents of harassment is

insufficient to avoid the application of § 10(j).[11] See D'Agostino, 367 F. Supp. 2d at 178 (finding

that school's failure to protect a student from the abusive acts of a teacher fell well within the

scope of the immunity provided by section 10(j) of the MTCA); Cormier, 479 Mass. at 42, 91

N.E.3d at 668 (ruling that plaintiffs' effort "to hold [a] school liable for not acting in a manner

that ensured [the student's] safety" was precluded under § 10(j) of the MTCA). Therefore, this

court recommends that the defendants' motion for summary judgment be allowed with respect

to Count IV of the Complaint.

### E. **Counts VI-VIII and XI-XII: Negligence Claims**

The plaintiffs' Complaint includes five separate negligence-based claims, including

claims by MG for ordinary negligence (Count VI) and negligent infliction of emotional distress

(Count VII); a claim by Ms. Grace for negligent infliction of emotional distress (Count VIII); and

claims by MG and Ms. Grace for negligent supervision of students (Count XI) and negligent

retention of Ms. Freund as a teacher (Count XII). The defendants contend that they are

---

[11] To the extent Ms. Nissan's actions in leaving *Gracefully Grayson* on MG's desk and Ms. Reed's conduct in initiating a conversation on the bus in which one of MG's peers referred to him as "gay" led to taunting and sexual harassment against MG by his peers, their actions "are too removed as a matter of law to be the original cause" of MG's harm. Cormier, 479 Mass. at 41, 91 N.E.3d at 667 (quoting Kent, 437 Mass. at 319, 771 N.E.2d 770)).

immune from such claims under section 10(j) of the MTCA.  (Def. Mem. at 23-25).  They also

argue that they are entitled to summary judgment on each of these Counts because there is no

evidence that they breached a duty of care that was owed to the plaintiffs.  (Id. at 22-23).  This

court recommends that the defendants' motion be allowed on the basis of immunity.

As described above, the MTCA governs tort claims brought against a public employer.

See Magliacane, 483 Mass. at 850, 138 N.E. 3d at 356.  Therefore, all of the plaintiffs'

negligence claims are subject to the MTCA.  The plaintiffs' arguments in their opposition to the

motion for summary judgment make it clear that all of the plaintiffs' negligence claims are

based on the defendants' alleged failure to take action, including their "decision not to

investigate MG's complaints" and other "reported instances of harassment[,]" their failure to

"take reasonable steps to prevent the injury or damage caused by all the constant bullying of

MG[,]" and their failure to remove MG from Ms. Freund's sixth grade class despite Ms. Grace's

requests to do so.  (Pl. Opp. Mem. at 27-29).  Because those claims "originate from a failure to

act" to prevent harm caused by third parties "rather than an affirmative act" by the public

employer, the defendants are immune from liability on those claims pursuant to § 10(j) of the

statute.  Cormier, 479 Mass. at 41, 91 N.E.3d at 667.

The plaintiffs argue that the defendants forfeited their immunity under the MTCA by

enabling or encouraging harassment and bullying of MG by students and staff.  (Pl. Opp. Mem.

at 30).  However, they have not identified any specific facts showing that the School's

administrators took affirmative steps to promote, assist or otherwise encourage harassment

against MG.  Instead, the plaintiffs repeat their assertion that the "School's decision not to

investigate MG's complaint of sexual harassment, name-calling ... and threat of physical

42

violence created, enabled, or encouraged the harassing conduct[ ]" of students and staff.  (Id.).

This is simply another effort to hold the defendants liable for failing to act.  "Such a claim is

precluded under the [MTCA]."[12]  Cormier, 479 Mass. at 42, 91 N.E.3d at 668.

### F.  Counts V, IX and X: Claims Regarding Anti-Bullying, Parental Notification and Reporting of Threats to Personal Safety of a Student

The defendants' next challenge addresses Counts V, IX and X of the Complaint.  These

Counts consist of claims for violation of the Massachusetts anti-bullying statute (Count V),

violation of Massachusetts' parental notification law (Count IX) and failure to report bullying

and harassment as required by regulations pertaining to reports of hazing by secondary schools

(Count X).  The defendants have moved for summary judgment on each of these claims, but the

plaintiffs have presented no opposing arguments.  (Def. Mem. at 25-29).  The plaintiffs' "failure

to put forth any argument in [their] opposition to defendants' motion for summary judgment ...

constitutes abandonment of any such claim[s]."  Montany v. Univ. of New England, 858 F.3d 34,

41 (1st Cir. 2017).  Accordingly, these claims have been waived.

In any event, even assuming the claims asserted in Counts V, IX and X would not be

barred by § 10(j) of the MTCA, it appears none of those claims are actionable under the

circumstances presented here.  In Count V, the plaintiffs seek to hold the defendants liable for

violating the Massachusetts anti-bullying statute, Mass. Gen. Laws ch. 71, § 37O, on the

grounds that the defendants "failed to prevent and intervene in stopping bullying targeted at

MG by students and School staff."  However, the statute expressly provides that "[n]othing in

---

[12] In light of this court's determination that the defendants are entitled to judgment as a matter of law on the plaintiffs' negligence claims pursuant to § 10(j) of the MTCA, it is not necessary to address at this stage the defendants' assertion that they are also entitled to summary judgment because they did not breach a duty of care that was owed to the plaintiffs.

this section shall supersede or replace existing rights or remedies under any other general or special law, *nor shall this section create a private right of* action."  Mass. Gen. Laws ch. 71, § 37O(i) (emphasis added).  As at least one judge in another session of this court has concluded, "the Massachusetts Legislature expressly declined to create a private right of action.  Without this private right of action, there can be no standalone claim under this statute."  Doe v. Holly, No. 20-10139-LTS, 2022 WL 1038012, at *5 (D. Mass. Feb. 25, 2022).

Both the Parental Notification Law asserted in Count IX and the hazing regulations asserted in Count X are inapplicable to the facts of this case.  The Parental Notification Law, Mass. Gen. Laws ch. 71, § 32A provides in relevant part that "[e]very city, town, regional school district or vocational school district implementing or maintaining curriculum which primarily involves human sexual education or human sexuality issues shall adopt a policy ensuring parental/guardian notification."  The plaintiffs claim that the defendants violated this statute by "subject[ing] MG[ ] to sexual education through the recommendation of *Gracefully Grayson*" without notifying Ms. Grace about the book ahead of time.  (Compl. at Count IX).  However, the record demonstrates that *Gracefully Grayson* was a book that was kept in the libraries of all the Brooke Charter Schools but was not part of a curriculum involving "human sexual education or human sexuality issues," as required to trigger application of Mass. Gen. Laws ch. 71, § 32A. (See DF ¶ 37; PR ¶ 37).  Similarly, the regulations set forth in 603 C.M.R. § 33.00 *et seq.* govern "the content and frequency of reports secondary schools must file with the Board of Education regarding the distribution of copies of the law against hazing and the adoption of a disciplinary policy concerning the organizers of and participants *in hazing activities*."  603 C.M.R. § 33.02 (emphasis added).   The regulations specifically define "hazing" to mean:

> *any conduct or method of initiation into any student organization*, whether on public or private property, which willfully or recklessly endangers the physical or mental health of any student or other person.  Such conduct shall include whipping, beating, branding, forced calisthenics, exposure to the weather, forced consumption of any food, liquor, beverage, drug or other substance, or any other brutal treatment or forced physical activity which is likely to adversely affect the physical health or safety of any such student or other person, or which subjects such student or other person to extreme mental stress, including extended deprivation of sleep or rest or extended isolation.

603 C.M.R. § 33.03 (emphasis added).  However, it is undisputed that the alleged bullying and harassment at issue in the instant case was unrelated to the initiation of MG into a "student organization."  Therefore, the regulations are irrelevant to the facts of this case.

### G.  Counts XIII-XVIII: Claims for Loss of Consortium

The plaintiffs' final claims, which are set forth in Counts XIII-XVIII[13] of the Complaint, consist of claims by MG, his mother and his four minor siblings for loss of consortium against the defendants.  In Count XIII and Counts XV-XVIII, the plaintiffs claim that MG and his siblings suffered a "loss of consortium, companion, society, services, and affection" of their mother, and in Count XIV, Ms. Grace claims that she suffered a "loss of consortium, companion, society, services, and affection of MG."  "[A] loss of consortium claim cannot stand without an underlying tortious act" by the defendants.  Harrington, 172 F. Supp. 3d at 354.  See also Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 315 (D. Mass. 2017) ("Consortium claims are derivative in nature, so it requires an underlying tortious act.").  Where, as here, the plaintiffs cannot withstand summary judgment on any of their tort claims, their loss of

---

[13] Count XVIII, which consists of a claim by Minor Child MP against the defendants for loss of consortium, is mislabeled "Count XIV."

consortium claims must fail as well.[14]  See D'Agostino, 367 F. Supp. 2d at 178-79 (where loss of

consortium claims are "predicated on negligent acts that are immunized by the MTCA[,]" the

"loss of consortium claims ... are also barred by the MTCA.").  Accordingly, this court

recommends that the defendants' motion be allowed with respect to Counts XIII-XVIII of the

Complaint.

## IV.   CONCLUSION

For all the reasons described above, this court recommends to the District Judge to

whom this case is assigned, that the "Defendants' Motion for Summary Judgment" (Docket No.

44) be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the

motion be allowed with respect to Counts II-XVIII of the Complaint, but denied with respect to

---

[14] The plaintiffs' Title IX claims cannot serve as a predicate for loss of consortium claims. See Harrington, 172 F. Supp. 3d at 345 (denying motion to dismiss claim for hostile environment harassment under Title IX, but dismissing claims for loss of consortium on the grounds that, inter alia, the plaintiffs' negligence claims had been dismissed and "a loss of consortium claim cannot stand without an underlying tortious act."); Edsall v. Assumption Coll., 367 F. Supp. 2d 72, 85 (D. Mass. 2005) (finding it clear that federal civil rights laws do "not permit[ ] an ancillary cause of action for loss of consortium." (quoting Tauric v. Polaroid Corp., 716 F. Supp. 672, 673 (D. Mass. 1989)).

the Title IX claims asserted in Count I.[15]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[15] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which the objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).